You may begin as soon as your opponent finds her seat, and I'm not pushing. Good morning. My name is Nancy Hinchcliffe, and I'm an attorney from Phoenix, Arizona, and I represent the appellant in this matter, Mr. Melchor-Zaragoza. And this is the case that involved a trial on five of the counts. It involved a change of plea on the sixth count, which involved reentry after deportation. And this is a case that involved the hostage-taking of illegal aliens and also the harboring of illegal aliens. There have been a number of issues that have been raised in our brief, and the first issue that I'd like to address this morning is the issue involving the bats in challenge. As the Court is aware, there was an individual by the name of Mr. Zepeda, an Hispanic individual who sat on the prospective jury panel in this case, and this individual was struck by the prosecutor. The defense objected on the basis that this person was struck, Mr. Zepeda, on the basis of his race. The standard which is set forth in Batson and also Hernandez, as the Court is aware, is first the defense has to establish that there's a prima facie case that this selection of this particular juror was in fact made on the basis of race. Now, the brief itself, of course, sets forth in some detail the questioning of Mr. Zepeda, and I'm just going to summarize it very briefly. Mr. Zepeda was an individual, he was a teacher at a local community college. He taught English and he taught Spanish at the community college. And, of course, he was asked these personal questions during Vora Dyer and very clearly and forthrightly and very simply, it was a very simple question, answered those kinds of things. During the questioning of the jurors, the prosecutor asked specific questions, not only of Mr. Zepeda, but of some other individuals who had indicated that they indeed spoke Spanish, and the defendant in this case, for the record, was a Spanish speaker. And many of the individuals who were involved in this case were Spanish speakers. Asked the question of some people on the jury who spoke Spanish, if in fact, because there were going to be interpreters used, if in fact the fact that there was an interpreter setting forth what was being said by these Spanish speakers would be a problem for them. In other words, if they thought there was a difference between what was said and what he knew as a Spanish speaker and as a teacher of Spanish, would he have a problem following what the interpreter said? And Mr. Zepeda clearly said no, that he could go ahead and follow as he should and as he would be instructed to do, whatever the interpreter said the Spanish speaker was saying. The problem arose, and the reason that Mr. Zepeda got selected, according to the prosecutor when this issue was raised, was because Mr. Zepeda initially, when asked a question, and it was a question about whether or not any of the members of the panel themselves or their family members had involved, been involved in some kind of, had been the victims of criminal conduct, Mr. Zepeda stood up and started to say, I guess, he was interrupted by the trial judge, as trial judges sometimes do, and said a microphone was needed because of the situation, and that they needed to use a microphone in the courtroom. And then Mr. Zepeda simply said, and this is detailed in verbatim in the brief, mentioned that he had misunderstood this question. Quote, I guess I misunderstood the question. I thought any of my family members had committed any crime. Yes. He did that quite forthrightly. Everything you're saying is correct, but when the prosecutor was called on the carpet and asked for a reason why this had happened, the prosecutor said that as a general rule, my policy is to pick people who listen and understand without it being repeated, because that's not what happens during the trial. And the prosecutor said, that's why I kicked off Mr. Zepeda, because he didn't understand questions, and I want jurors who are attentive enough and sharp enough to be paying attention. And then we have a trial court's ruling who was sitting right there saying that that's a nondiscriminatory explanation and there's a failure to show that this is a pretext or pretextual, so the challenge is denied. Now, how do we as an appellate court penetrate that? On its face, there's a reason given. The person isn't paying that close attention. Routinely, I knock them off and the trial court says, I'm sitting right here watching this, and I find it's not a pretext. How in the world do we penetrate that on appeal? Well, of course, it can be penetrated. It may be difficult to penetrate. But how do we do that? The burden is, is there a clear error here? And that's what I'm stating to this court there was in this particular case under the facts of this situation, and that's why this was set forth in great detail. Before a reason, it is true this reason has been given, I submit to the court that the reason has to make sense and it has to be a credible reason. Why doesn't that make sense? People don't pick up on what's going on in a trial. You don't have time to say time out. I didn't quite understand that. Why is that not credible? I'm saying if you look at it, I'm saying if you look at the total picture of what was going on with this particular juror, which I stated, I don't need to repeat, that it's clear that this is a ruse. The juror said it came out of the juror's mouth. I didn't understand the question. That came out of the juror's mouth. That's not somebody saying I'm interpreting what he said or didn't say as misunderstanding, but I misunderstood the question. That's true. The juror did. So then the prosecutor says I don't have time for people who don't understand what's going on. And I'm saying that that is not a realistic view. It is not a true reason to strike someone with the background of this individual. And in light of, you know, this is one question that's asked, Your Honor, out of many, as the Court well knows. And he had difficulty on this one question just to a very minor degree. And I submit, if you read the record, he realized as soon as he stood up that he started to say I guess and was interrupted. I think the gentleman realized as soon as he stood up that he may have misunderstood this question. Would you repeat it? And then he sits down. And I'm simply trying to state that in the basis of the argument here is that it was a clear error in light of the fact this is the only Hispanic person who is on this particular pool of jurors that are going to be selected in this particular case. And to say that someone who is a teacher at a community college who teaches English and who teaches Spanish, that somehow he's not going to be able to understand the questions. Well, but those are all things that you can debate. Here I think I have to agree with Judge Trott in the sense of it's very difficult to penetrate that in terms of the trial court was there. He did, in fact, say he misunderstood it. It's not, you know, it's not without reason that lawyers would be concerned about someone that doesn't get something right the first time. I mean, I think your better argument, and I don't want to tell you how to spend your time, it goes to the statements that were made about killing the Panamanian and the security guard. I mean, I do have some questions about that. But I'm... Well, let's move on to issue number two. I'm not really persuaded by the juror argument. I will just tell you that. Well, the argument has been made, and I think it's set forth exactly what we're going after in the brief. And I would ask the Court to consider it. But in terms of issue number two, Your Honor, you've indicated that you have questions for me regarding it, and my time is dwindling. Oh, we're going to give you plenty of time. Go ahead. Okay. Well, issue number two is the issue, as the Court just indicated, involving a motion in limine that was made in this case. The defense attorney realized early on that there might be a little problem with prejudice to his client if this information about killing a Panamanian and shooting a security guard came out in front of the jury. And he made a motion. It was a rather simple motion. It's included in the excerpts of record. It's just a one-pager. But it basically expresses concern that this is prejudicial information and 404B information. The motion is argued to the Court, brought to his Honor's attention. Excuse me. Does the motion cite 403 too, in addition to 404B? Is that what it's all about? Judge, I don't think it cites 403. Okay. Now, I'd have to look. It's there, and it speaks for itself. The attorney, when he argued it … I wish you would speak for it, but go ahead. I'm sorry, Judge. I should know that, and I don't. And I apologize to the Court. I will tell you this, however. At the end of the hearing where this was argued to the Court, the prejudicial effect of this information was discussed and was the thrust, really, of defense counsel's argument. The motion that was filed itself, as I stated earlier, was just basically a one-paragraph motion that was filed initially. And I don't honestly remember if it states 403. In any event, the motion was argued to the Court, and let there be no mistake that the judge granted the motion in limine. The minute entry supports it. The record supports it. However, to be forthright and honest, the judge did indicate that he might revisit the issue if the proper foundation could be laid by the prosecution in this particular case to support the admissibility of this particular information. But the motion in limine was, in fact, granted by the Court. The trial proceeds. The witness that is going to give information about this particular, the Panamanian and the security guard is on the stand, and Mr. Wilson, defense counsel, sees it coming, as a good defense counsel does, and realized that they were about to get into this particular possible testimony. And so he objects. And the objection is overruled, and he's not really clear. He doesn't remind the Court of where he's headed on this. The prosecutor then continues to ask questions, and it's at this point that the witness on the stand mentions, first mentions the Panamanian and the killing of the Panamanian. Again, I think as the Court's aware, this is a situation where prisoners are lying down either awake or asleep. Right. It's late at night, down on the floor. It's not clear who said it. Talking back and forth. The witness cannot, in fact, say who said this. Right. It's the two guys on the couch. My client is one of the guys on the couch. One of the two captors. Right. Does that make it more or less prejudicial, the fact that the witness doesn't say which one it came from? Well, I mean, obviously there are allegations of a conspiracy here. Right. And to be frank, I suppose in a conspiracy case it's less so in the sense that people can be held accountable, at least in terms of committing a crime for the acts of others. But I would argue to the Court that it is more prejudicial because here is this guy who may not be saying these things. The jury has no idea who it is. And it's very vague and unclear as to exactly what the content of this conversation is. And, yes, they could very easily hold it against my client as being the one who killed a Panamanian and shot a security guard. Do you concede that there's any probative value to it? Perhaps, to be frank with the Court. All right. I mean, obviously the prosecutors argue that it goes to, I think, both to the victim's state of mind and also to the defendant's state of mind as to intimidation, correct? Correct. And obviously there's a lot of other evidence about intimidation. You've got gunplay and you've got all of this. But could the argument be made as what would be more probative than, you know, threats of violence to others if you want people to, you know, comply with you or to intimidate them than words out of the co-conspirator's mouth? I mean, you know, I don't know. There's a lot of bad stuff going on here that's pretty intimidating. There is a lot of bad stuff going on. And you're right. The Court felt finally in this case that this was an indication of intimidation and that, in fact, it might influence these people into doing certain things. But as you just stated, Your Honor, there was plenty of intimidation going on in this particular case. And when 403 was mentioned, even if this evidence would be ruled irrelevant for some reason, whether it be the intent of the speaker or its effect on the hearer, you still get to the issue of the prejudicial effect. And as the Court just pointed out, you have my client, who is not even being identified as a speaker in this case, being basically bombasted, bombarded with this kind of very, very prejudicial testimony in this case, in a situation where I think that you cannot say that this very damaging evidence would be the point of value. Well, how prejudicial is it relative to the other? I mean, obviously they've been, you know, these people were taken at gunpoint, right? Threats were previously made. And then when they were on the floor, you know, they're playing with guns and they're, you know, talking about these things. I mean, could the argument be made that, you know, I mean, hey, either they're boasting about this or, you know, using it to intimidate them, but how much worse could that be than a gun? I mean, I guess the worst thing is that they used a gun on someone else. But then doesn't that make it more probative that it would be more intimidating? You know, I don't know. It's hard to pull it out. Well, in terms of prejudicial effect, I'm not sure that that analysis is the correct one. Well, what's the prejudicial effect then? The prejudicial effect is you think you've got a maniac with a gun sitting there. Don't they think that already? I mean, look at what's already gone on. Don't they already know that their lives are under threat by armed outlaws? Well, I'm not going to stand here and try to say that people, and rightfully so, wouldn't feel intimidated and threatened by the situation. That's very true. They would. But I think that it is certainly much more intimidating to think that you might be killed. Even though a gun is a threatening thing. We're going to give you plenty of time. But the purpose of this was to hold these people so that people would pay up and basically bond them out, if you will. And that was happening right and left. Why isn't this harmless air? I mean, it just seems to be accumulative to a very small extent with respect to the direct threats against them that had already been made. Why isn't it harmless air, even if you're right? Well, I just submit to the Court it's not. That the overall effect in this particular case of knowing that these individuals may have committed other offenses, and specifically my client, has committed another offense involving killing a Panamanian and shooting security guards, the gun was used in this case to basically intimidate these folks into paying up. Wasn't the representation made, you better stay here, we're going to kill you? That's basically what the representation was. Well, do you mean verbally or just basically? Overall. They understood the reason why they were cowered on the floor is because they understood that they're confronting armed gunmen. You're using the word cowered, and I don't know if we have evidence in the record that they cowered on the floor. What we're talking about right now is late at night. There's a bunch of folks, and they're down on the floor, and they're sleeping. And, in fact, if you read the testimony of this particular witness, there's no indication at this point he in particular is cowering from this. He basically is listening to this. It's late at night, and there's really no testimony. So you're conceding he was awake? Who was awake? The fellow on the floor? Yeah. Yes, the fellow on the floor was awake. He had to be. He was testifying about himself. We're not sure whether the speakers knew he was awake, though. That's one of your points, too, right? Well, and that's the point. I mean, it's not a situation where there's no evidence. One can assume all kinds of things about why they were saying these things, and one can assume that they were boldly trying to intimidate everybody on the floor, and they were all fainting asleep. But in point of fact, there's really no evidence in the record that this was being done at that particular time to intimidate these folks. Except the trial court said it's obviously made for the purpose of intimidation, and intimidation of the same type that flashing a gun or a threat might be made. So that's a finding of fact with respect to the purpose for which the statement was made. It was made to intimidate. I'll tell you what. I don't mean to interrupt you, but we've got to hear from your co-counsel. Understood. Thank you. Thank you. Thank you. You have two minutes. Don't be intimidated by the clock. As long as I get some of that reward money for saving time, I don't care. Go ahead. Don't be intimidated. My argument is rather simple. They applied one sentencing standard to the first group of defendants. My client is caught two years later. They apply a different sentencing scheme to him. In this case, you need to apply the same sentencing scheme. Where is the law that says that? What case or what statute or what guideline or what rule? Well, it's the basic sentencing guideline proposal. The sentencing guidelines say basically that the purpose of the sentencing guidelines is so that there is not great disparity in sentencing. And you're absolutely right. That's what Senator Kennedy said and the entire Judiciary Committee said. Nevertheless, is there any case or rule that says you've got to balance these out in an individual situation? I couldn't find anything where you had a case in which a group was sentenced first and then there was some wait time and then another guy comes in and they decide, we're going to change the way we think about this and we're going to do it differently. I didn't find a case to that effect. You know, I have to tell you, and I will not use this in deciding this case, but the other day I was watching the Senate Judiciary Committee on C-SPAN and the senators were beating Judge Pickering to death from Mississippi because he dared reach out in a case involving three defendants and tried to equalize the sentences. And it was very interesting to watch because I had been studying your case and here the senators were pounding somebody to pieces and accusing the judge of being a lawbreaker because the judge felt that he ought to balance the sentences between three defendants charged with the same cross burning. So for what it's worth, I guess that's why we don't use the Senate Judiciary Committee as a marker in cases. And I did find that a rather strange way of attacking someone when he was trying to do what seems to be right. And that's kind of what I'm asking the court to do here. It is. And that's why I ask you, is there any rule or regulation or guideline or case that even gives us the power to do that? Well, yes, there is. The basic guidelines. Boy, we're going to get in trouble with the Supreme Court on this one. Go ahead. Sentencing Guidelines, Chapter 1, Part A, Subsection 3. The basic approach, and I'm quoting, Second, Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders. It said narrow. It didn't say make it perfect. Well, but it says here, granting such broad discretion, however, would have risk corresponding broad disparity. So they're saying, look, we don't want, the purpose of these guidelines is that we don't end up with a situation just like we have here today where one guy, because the judge has broad discretion, gets a sentence of 131 months, and another guy, the co-defendant in the exact same case, no criminal history different, receives a sentence that is practically double. Remember that Mr. Ramirez Melkor receives 138 months. My client, exact same criminal history, at the exact same place, receives 250 months. So basically, Mr. Melkor gets half the sentence my client does for the exact same crime. And the only thing that we can point to is the fact that the probation office changed their policy in the middle of this case as to how they were going to count and group. I think maybe they added in the years he had between the time he had where he wasn't sentenced. Well, right, right. I mean, granted, there was a lot of time. I mean, I think there was more than a year gone by between the first sentencing and my client's sentencing. But in this case, you need to take a look and apply the same standards in the same case. You know, you would put your finger on something that makes sense as an abstraction. There's no question about it. One might think that if Congress had been worried about that, they would have either enacted a statute or a guideline would have been created to give a sentencing judge the power to override disparities created by people appearing at different times. But that just hasn't happened. I understand, and that's what I'm asking you to do today. How would we write that? Based on what you said? We said all of the guidelines, rules, and regulations, notwithstanding, from the part that you read about the purpose of the rule, that we're going to say that a sentencing judge has the power to override all of it in order to balance it out. And then whose sentence do we use to balance it out? Could you take somebody who got four months and say, well, you know, the probation officer says you should get four months, but these other people got 36 years, so we're going to give you 36 years, and we're balancing it out to make it all fair. Well, I think that's a little bit different in that in this case, the prosecution had the opportunity to appeal the sentence. If the sentence in the first two cases was administered erroneously, the government had the opportunity to appeal those sentences and say, no, look, you didn't count this right. You're supposed to do this, this, this, and this, and you didn't do that. And because of that, the sentence is now half of what it should be. They didn't do that. They were willing to accept the sentence as correct, and I believe that the sentence as correct in the first two cases, whatever calculation method was used. I understand that in this case, but, you know, about all cases, and let's say a situation where you've got three defendants and they're still before the trial court, and for one reason or another, one of the defendants comes in with a really high sentence. Would your principle allow a judge to say, I really think that that's where this ought to be, so we're going to elevate these other people in the interest of equal protection and blast them with the same sentence, even though the grids and everything like that suggest that that's not appropriate for their case? Well, no, because I think that the trial courts have the discretion to say, look, there's a reason why I'm going to give this fellow a much higher sentence, and I can upward depart without breaking the sentencing guidelines. As long as I give a good reason, I can upwardly depart and give defendant X a much harsher sentence than I give defendant Y, and here's the reasons why. In this particular case, there were no reasons why. So what are you asking us specifically to hold in this case regarding your client? What I would like the court to do is to remand this case for resentencing consistent with the manner of sentencing the first two defendants in the case. What does that mean? You know, that's nice, but what does it mean? I'm the trial judge. I get that back, and I say, what does this mean, consistent with? Order that the order that a new pre-sentence report be written, that the same method of calculating the sentence used for the first two defendants, that that same method of calculating the sentence be used in Mr. Garcia-Reybolar's case. Because what they did was they applied the statute differently the second time around. And so I'm asking that the court remand it with specific instructions that the court, through the probation office, calculate the sentence the same manner that was calculated for the first two defendants. And the court can then take and depart as it deems appropriate. And what's the infirmity in the calculation process? Or is it, again, just to balance this out between the two? I mean, there's got to be some infirmity in the calculation process, doesn't there? Well, I have discussed this quite a few times with the probation office. They say that when they up till 2002, when Mr. Garcia was sentenced, they had interpreted the sentencing guideline grouping and counting in one way. So essentially the first two people got a benefit of their mistake is what they're saying, and they realized the error of their ways, and then your client got the full boat. Yes. You want the benefit of the mistake. No. You want the benefit of the mistake. Because nobody's ever said it was a mistake.  That's the problem. Nobody's ever said that what they did the first time around was a mistake. So all I want is them to not make a mistake in my client's case, that they seem to say that there was a mistake in the first two, so we're going to punish the second guy. And I'm saying that there wasn't a mistake in the first time around. It was the method they'd used in calculating sentences for years, literally years in our district court, and that they ought to not change in midstream how they're going to calculate defendants similarly situated. All right. Do you have anything else you'd like to tell us? I do not, Your Honor. You better just maybe add just one more point. How do you get around the waiver issue that in the plea agreement this issue has been waived? Your Honor, I don't believe this issue has been waived, and I'm sorry I didn't address that. Unless the defendant waives any right to appeal or whatever, if the sentence imposed is consistent with the terms of this agreement, and in the agreement under the terms it talks about the maximum could be imprisonment for life and other possibilities of sentence, this sentence is within those terms, seems to fit within the waiver, and that's the end of your appeal. Now, what's wrong with that? What's wrong with that, Your Honor, is the precept upon which that is founded is that as long as your sentence is within the guideline range that is appropriate for your case, then you've waived that. What I'm saying is the wrong guidelines were applied, and therefore we didn't waive that very, very narrow issue of You were sentenced within the terms set forth in the agreement, and you said as long as you're sentenced within those terms, you're perfectly happy. No, the way that I interpret that, as long as you were sentenced within the guideline range. That's not what the agreement says. It says as long as it's consistent with the terms of this agreement. Well, yes, but the agreement, yes, Your Honor, but at page 2 of the agreement, the agreement does say that you're going to be sentenced in accordance with the sentencing guidelines. Well, it says what the, according to the sentencing guidelines, the court shall order the defendant to make restitution, ordering to pay a fine, serve a term of supervised release, period. And then there's another one. But that's all part of the same section number one of maximum penalties. Right. No, but it's the next section under agreements regarding sentence. Right. And I'm just. What I'm saying, Your Honor, is that under penalties or under terms, it implies that you're going to be sentenced according to the sentencing guidelines. I understand, Your Honor.  Thank you. Thank you, counsel. Good morning. I'm Lisa Janice Settle, and I represent the appellee in both cases for Mr. Melcher-Zaragoza and Mr. Garcia-Raybillar. It seems that the court is interested in the second issue raised by Mr. Melcher-Zaragoza. Well, it seems that, you know, as a former trial judge, we don't really like it very much when we make motions and, you know, we rule on a motion in limine and then the prosecutor goes right against it and tries to sneak it in. And then now, you know, I mean, obviously the court said you can't get it in unless you lay some foundation. And then the prosecutor just shoots it in and now wants to say, well, it was an error and it was harmless anyway. Well, I want to be clear with this panel. I acknowledge that my brief poorly demonstrates that in the heat of trial, the prosecutor forgot to request that it be reopened. However, the prosecutor. That would be a nice way of putting it, but that's the. But that's what happened. The judge granted the motion in limine, uses those words, and says I might consider lifting it if the appropriate foundation is laid. My first question is, how many days before the trial did that motion in limine take place? Roughly. How many days before trial? Because what I'm getting to is, is it true that the trial judge forgot that the motion in limine had been granted? That's what I read from this record. Well, the ruling in limine appeared. But it wasn't that many days before. It was March 11th when the ruling occurred. And did the trial judge then forget that that ruling had been made? Yeah, the prosecutor forgot. I can't I can't say what happened to the trial judge. We're kicking out Cepeda for not paying any attention. Maybe we should have kicked out the prosecutor and the judge. Well, even though the United States did not ask for it to be reopened, the United States did lay because she forgot. I was a prosecutor. I forgot. I did lay proper foundation. Oh, you don't forget when it's something like you want to get in that some guy murdered someone or that they, you know, that they shot someone. You don't forget that type of thing because that's a sting to your case. Well, in the Cepeda trial, there wasn't a written order. And he said that if proper foundation was laid, he was apt to let it in. The reason why he denied the motion in limine. Well, but the prosecutor couldn't even lay the proper foundation. If what you're saying, if we believe that the proper foundation was who made the statement, the prosecutor wasn't even successful in ever doing that. No, actually, he didn't say that that had to be the proper foundation. He said he didn't say it mattered who made the statement. And it's the United States position. It doesn't matter who made the statement because they're co-conspirators. So what was the proper foundation? The proper foundation was I think at the time we were doing the motion in limine, we didn't even know which victim heard the statement. So we needed the victim to be on the stand to say what he heard and what were the circumstances surrounding what he heard and describe the people talking. He didn't say that it had to be the defendant. And, in fact, it doesn't make sense. It doesn't have to be the defendant who is making the statement. Well, that aside, we have to analyze it in terms of the law. But I think you're defending, you know, I mean, that's not very, you know, I don't think that having been a prosecutor, I don't think you forget those type of things. But that aside, let's just assume that what's your best argument for it being probative? But let's just say after and then, you know, after. I think part of the argument you said is it was to intimidate and also to stay the mind of the victim. Well, after the statement came in, did anyone say to the court after, well, give a limiting instruction to the jury and tell them this isn't for the truth of the matter that they did, in fact, you know, kill a Panamanian or shoot a security guard. It was, it's just to show that it was part of the intimate, you know, it goes to the element of intimidation or it goes to the victim's state of mind. Well, certainly during jury instructions, the court did instruct that the jury was only to consider the crimes charged in the indictment and not, you know, anything else that it had heard. I mean, it wasn't as specific as to this. So did anyone ask to have it limited? Or it seems that the prosecutor was just pretty happy to get it in. Well, again, you know, it was never referred that it actually happened. And I don't think even if it was error to let it in, it's harmless. I mean, it's just evidentiary. It would just be evidentiary error then. And it was certainly harmless because it's just a statement. And you asked that question earlier, is it more or less prejudicial if the defendant did not say it? And I think it's less prejudicial because it was just a statement made by a co-conspirator. We already have evidence that the defendant and others racked guns, that they threatened to kill people. And they actually verbally said, I'm going to send you home in a box. And the victim said they thought they were going to die and that they were going to be killed. If it's that insignificant, why did you use it? Now you're telling us it's utterly insignificant. Well, it's insignificant in retrospect in light of the entire trial. This was just an intimidating factor. And that's what the judge found, that it was just a statement. It's certainly not 404B material as raised in the briefs. It was never presented that it actually occurred. It was just that it was an impact on the state of mind of the victims. And the victims stated that they were scared and that they still had nightmares even two years after this happened. Well, that's true. But we have this law that in the 404B analysis you include 403. And so admittedly you would say, well, fine, it's relevant. But we need to talk about probative value and prejudice. Well, it's certainly probative to the elements, that they were not free to leave, that they were being one of the elements is that they were detained. But where did the judge balance as the judge is required to do in 403? I have found nothing that the court said that relates to balancing probative versus prejudice. He doesn't specifically use, you're correct in saying he doesn't. Strike specifically. He doesn't say 403. But he does strike a balance because he compares the statement to the flashing of a gun and making threats. And he says it's just like those statements. The defense counsel used the words 403, at least in the motion in limine. And then, as I recall, also at the time during the trial at the sidebar, he also mentions 403. The lawyer does. Even if it's relevant, the court has to go through a weighing process on the record where the court weighs the relevance against 403. And what I'm looking for is where the court did that. And the court doesn't specifically say 403. It doesn't specifically. It doesn't say it, period. He doesn't say it. He doesn't even hint at it. Well, I think he's hinting at it by comparing the statements to those of flashing guns and making threats, which are just replete to the entire proceeding. I mean, every victim corroborates that this defendant and his co-conspirators were members of this group that stole aliens over a period of seven months, 200 aliens. They made threats. They held guns. There is no evidence to the contrary that any of this did happen. One standard way of protecting a record is for the prosecutor to say, Your Honor, the menial Ninth Circuit requires you to balance this. And the other side is asking, I'd ask for the record that the court make a statement as to whether it's balanced prejudice against probative value. Did the prosecutor say anything like that? No, the prosecutor did not. Good way to protect one's record. And the prosecutor in the future will certainly be making those statements. However, again, I think that the error, if there is any, is harmless. The evidence is overwhelming. Everybody testified that there were guns. The defendant had guns. Okay, so when you say it's overwhelming, when you say everybody testified, okay, we're talking about some people took a deal and testified, right? Yes, three co-conspirators. And you have, what, a couple of victims? Two victims. Any confession? Just the only, no, not really a confession, just a statement which would place him in the apartment, the second apartment where they were held before they were arrested, but not a confession as to that they did it. Any physical evidence? Physical evidence, a gun. Guns, fingerprints, DNA, you know, stuff like that. Just a gun was found in the apartment. Mitochondrial DNA. No DNA testing. Just the victims were with him for a very long period of time, and the co-conspirators, one I think was even related to the defendant, they had known him, and this is something they had done as a gang over a period of seven months and done at least for 200 victims. All right, so you're not conceding error, but assuming error for purposes of error, your position is harmless in view of the amount of evidence. Yes, Your Honor. Did the defense request any, once this all came in, did the defense request any limiting instruction? No, Your Honor, I believe it did not. Is that a factor? Well, they, I think because there isn't a specific, there is that instruction that you're just considering evidence as to the crime or just considering the crimes that occurred. I mean, really, to have a limiting instruction would be more like 404B, and there was certainly no evidence that this ever occurred. Now, the prosecutor mentioned this several times. Did the prosecutor ever mention it in terms of the truth of it, or did the prosecutor always tie it to the elements of the crime? The prosecutor tied it to intimidation. Never did the prosecutor say that it actually happened, just that they were intimidated by these statements. How many times did the prosecutor say that, though? I know that it was said in closing once. I don't recall off the top of my head if it was mentioned once again. It was not more than twice. It might have been mentioned once again in rebuttal, but it was mentioned in closing. If I could move on to address Mr. Garcia-Reyballard's argument about sentencing disparity would be the term that I would call it. First, the guidelines were properly calculated. There's no dispute in that. The defense counsel didn't raise that they were improperly calculated. In fact, it's not raised on appeal by either defendant. The judge found that they were properly calculated. The United States agreed that, in this case, they were properly calculated. But besides that, clearly the court had the discretion to downward depart if it wanted to, and it knew it had the discretion, because under the Coperna case, you could, for sentencing disparity, you can depart downwards for a co-defendant, and in this case, even though it wasn't a co-defendant, it was a co-conspirator, and the United States certainly let it be known to the trial court that it knew that it could downward depart if it wanted to, to make the sentencings equal. Now, the court did not want to downward depart. It stated that clearly on the record, and, in fact, it doesn't give the defendant the low end of the guidelines. The guidelines are 210 to 262 months, and the court imposes a 250-month sentence. So the court knew that it could downward depart, and it just, clearly on the record, said it didn't want to. Was probation using two methods of making these calculations, and did it change its way between sentencing? Your Honor, it did change its way. It wasn't using two methods. What happened is that there haven't been many hostage-taking cases under, you know, 18 U.S.C. 1203 in our district, and there was quite a large one prior to this, and that's where they learned that perhaps they weren't doing it correctly and they should be adding units. However, the difference, as stated in the briefs, is not as great as the defendant claims. I mean, the first defendants were sentenced at a level 33. This defendant, Mr. Garcia-Rabiar, was a 36. But then that's only a three-level difference. It's not really a five-level difference, as in Mr. Melchor Zaragoza's brief. Because if you don't add units, then you would have multiple vulnerable victims, and that's an issue that's raised by Defendant Melchor Zaragoza, but I believe has already been decided by the Ninth Circuit that they actually are vulnerable victims. So they were calculated correctly for these two defendants. The previous defendants, you know, they were incorrect, but no one knew. I mean, it's not like the United States knew that they were wrong and could appeal it. It had never been calculated a different way previously. So as far as the United States and the district court knew, the first time the co-defendants got sentenced, it was proper, and it was a mistake. And they did benefit from this mistake, but they also had much less of a role than the two defendants who are here today. You also had the benefit of a trial judge having a trial. The first people were sentenced prior to trial. This defendant, Mr. Garcia-Rebillar, was sentenced after trial and therefore also knew what his role was, and we knew a lot more about the facts of the conspiracy. Anything else? The other issues are well addressed.
judges: Thompson, Trott, Callahan